**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-13547

————————————————

AFRICAN PEOPLE'S EDUCATION AND DEFENSE FUND, INC.,

*Plaintiff-Appellant,*

*versus*

PINELLAS COUNTY,

a political subdivision of the State of Florida,
by and through the Pinellas County Board,
of County Commissioners,

*Defendant-Appellee.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:23-cv-02395-TPB-AAS

————————————————

2                       Opinion of the Court                  24-13547

Before NEWSOM, BRASHER, Circuit Judges, and HUCK,* District Judge.

NEWSOM, Circuit Judge:

Florida nonprofit African People's Education and Defense Fund twice applied for COVID-relief grants from monies made available to Pinellas County by the federal government. The Pinellas County Board of Commissioners initially approved APEDF's first grant request but later revoked that approval; the Board denied the group's second grant application outright. APEDF sued, contending that the Board had revoked the first grant and denied the second on the basis of race and because of the group's association with the "Uhuru Movement"—which APEDF describes as a collection of "like-minded groups and individuals promoting Black community empowerment." The district court dismissed APEDF's First Amendment, equal-protection, and procedural-due-process claims at the pleadings stage. We affirm in part and reverse in part. In particular, we hold that the district court was correct to dismiss APEDF's procedural-due-process claim but that it erred in dismissing the organization's First Amendment and equal-protection claims.

---

* Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

**I**

**A**

Because this case comes to us on appeal from the district court's grant of a motion to dismiss, "for purposes of this appeal, we take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." *DeMarcus v. Univ. of S. Ala.*, 133 F.4th 1305, 1309 n.1 (11th Cir. 2025) (citation modified).

The African People's Education and Defense Fund is a § 501(c)(3) nonprofit organization. For almost 30 years, APEDF has served the black community of south St. Petersburg, Florida. APEDF's stated mission is "to defend the human and civil rights of the African community and end the disparities faced by African people in health, healthcare, education, and economic development." Am. Compl. ¶ 1, Dkt. No. 35. To that end, APEDF provides a host of services: It operates a gym, a licensed kitchen, a community center, and a Saturday school, and it performs free HIV testing. APEDF also runs a radio station, "Black Power 96," which broadcasts community health information, provides internships for local youth, and supports local musicians.

APEDF's community center is called the "Uhuru House." In Swahili, the word "Uhuru" means "freedom." APEDF asserts that it is associated with the "Uhuru Movement"—which, it says, "is not a distinct or formal entity, but a broad characterization of like-minded groups and individuals promoting Black community

empowerment, such as the 'Black Power Movement' or the 'Civil Rights Movement.'" *Id.* ¶ 51(a).

Like so many other organizations, APEDF was hit hard by COVID-19. Recognizing the pandemic's widespread economic impact, Congress passed the American Rescue Plan Act of 2021, which authorized relief funds. Pub. L. No. 117-2, 135 Stat. 4 (2021) (codified at 42 U.S.C. §§ 802–803). Pinellas County received ARPA money to provide COVID-relief grants to nonprofits. Thereafter, the County contracted with the Pinellas Community Foundation to review grant applications and make recommendations to the County's Board of Commissioners.

In September 2022, APEDF applied for an ARPA grant to purchase radio-station equipment so that Black Power 96 could "continue broadcasting timely information on local health and educational services and emergency alerts." The Foundation ranked APEDF's application fourth out of the 55 that it received. On the basis of the Foundation's assessment, the Board approved funding for the 34 highest-ranked grant applications—including APEDF's. Soon after, the Foundation sent APEDF an email confirming that it would be awarded $36,801. The Foundation followed up with a draft contract, which APEDF received, signed, and returned.

A month later, though, newly seated Board member Chris Latvala raised questions about APEDF's grant. Via text, he directed his aide, Tyler Bonneau, to "Google the African peoples one." Am. Compl. Ex. F at 2, Dkt. No. 35–6. When Bonneau responded, "That's the Uhuru House in St. Pete" and said that

APEDF's "website doesn't look so good," Latvala replied that he was "going to raise hell." *Id.*

Two days later, Latvala texted Bonneau again: "[L]ook to see if this African group is a hate group or the uhurhus [sic] by ADL [*i.e.*, Anti-Defamation League] or sovern [sic] poverty law center." Am. Compl. Ex. G at 1, Dkt. No. 35–7. Bonneau responded with a screenshot of an ADL webpage that included the following description: "The Uhuru Movement, also known as the International People's Democratic Uhuru Movement (InPDUM), is a Florida-based international socialist Black separationist organization." *Id.* Quoting the ADL site, Bonneau texted that "[t]he Uhuru Movement has ties to antisemitic Black Nationalist organizations." *Id.* Latvala then asked: "[I]s the radio equip for [B]lack [P]ower 96"? *Id.* at 2. Bonneau replied that the grant list didn't detail how the funding would be used. *Id.* Latvala ended the conversation by complimenting Bonneau's "great work." *Id.*

Later the same day, Latvala voiced his concerns at a Board work-session meeting, asserting that "[a]ccording to [APEDF's] website . . . they're associated with the [Uhurus] in St. Petersburg." Am. Compl. Ex. H at 1, Dkt. No. 35–8. Latvala asked Foundation CEO Duggan Cooley: "[H]ow would a group that has ties to antisemitic nationalist groups get approved for funding?" *Id.* Cooley responded that APEDF "went through the funding process like other organizations." *Id.* He acknowledged that the Foundation was "concerned about some of the issues that ha[d] arisen because of [an] FBI investigation" of the Uhuru headquarters, but said that

after flagging these issues for the County he was advised that APEDF's application should "be scored in this process like every other organization." *Id.*

During the same meeting, Latvala charged that the Uhurus "once held a mock trial in which they sentenced the mayor and chief of police in St. Petersburg to death[.]" *Id.* Cooley said that while he was "not familiar" with that episode, he was "familiar with some of the other challenges" associated with the Uhurus. *Id.* Latvala also claimed that the Uhurus "support the release of all black prisoners." *Id.* Cooley responded that he didn't know about that, either.

The following day, Latvala texted Bonneau again: "[T]he [U]hurus are claiming we are discriminating if we defund them." Am. Compl. Ex. G at 3. But, he said, "One of my questions yesterday was about political parties being eligible so we are going to use that." *Id.* He signed off by saying, "[T]his ain't my first rodeo." *Id.*

A few days later, Latvala directed Bonneau to "write down that African group on a sheet a [sic] paper for the meeting." Am. Compl. Ex. I at 1, Dkt. No. 35–9. At a Board meeting the following day, Latvala formally moved to revoke APEDF's funding. During the meeting, Latvala explained that he "d[id] not think that we should be funding radio stations with the amount of needs that there are in our community," and that, instead, the Board should "prioritize[e] people over products and things." Am. Compl. ¶ 82. The Board ultimately revoked APEDF's radio-equipment grant. APEDF wasn't notified that its grant would be discussed at the

Board meeting, and the Board's agenda didn't list the grant as an agenda item. In its complaint, APEDF alleges that at least four non-profits that serve predominantly white communities—and aren't black-led—received grants for "products and things" despite Latvala's stated opposition to that type of funding. *Id.* ¶ 85.

A month before the revocation of its radio-station grant, APEDF had applied for a second award in the amount of $67,327 to fund the purchase and installation of an "urgently needed" back-up power generator for its building. *Id.* ¶¶ 42, 88. APEDF had experienced frequent outages due to storms and an aging power grid, and it contended that a back-up generator would ensure its ability to keep the radio on air, the kitchen open, and the food in its commercial refrigerators and freezers cold.

After the revocation of the radio-station grant, though, the Foundation raised concerns about APEDF's second application. In an email, Cooley stated that "[t]he ARPA Nonprofit Capital Project Fund eligibility requires that the funding benefit 501(c)(3) direct service nonprofits." *Id.* ¶ 45. That was a problem, he said, because it was "impossible to isolate the benefit of generators to solely benefit the African People's Education and Defense Fund"—the generator that APEDF sought, he believed, would be installed in a building that it shared with the African People's Socialist Party. *Id.* APEDF denies that it shares a location with the African People's Socialist Party. It further denies that location-sharing restrictions appear in the eligibility criteria posted on the Foundation's ARPA Nonprofit Capital Project Fund's website and insists that numerous

ARPA grant recipients (including the YMCA) share their spaces with other groups.

Eventually, Cooley distributed a memo with the Foundation's funding recommendations. It endorsed approval of 19 of the 78 applications, including APEDF's. Indeed, the Foundation ranked APEDF's application fourth overall, though it footnoted a concern about recipients sharing a benefit with non-applicants. Two months later, the Pinellas County Commission's staff recommended changes to the Foundation's list, including a directive to "unassign" the funding for three applicants—including APEDF. *Id.* ¶ 49. The stated reason for "unassign[ing]" APEDF's funding was that the project wouldn't directly counteract COVID's effects. At a later meeting, the Board voted to fund all applicants on the Foundation's original list except APEDF. In its complaint, APEDF alleges that at least three nonprofits that serve predominantly white communities—and are not black-led—received grant funding even though their projects wouldn't directly counteract COVID's effects.

**B**

Following the denial of its second grant application, APEDF sued Pinellas County, by and through its Board of Commissioners, under 42 U.S.C. § 1983. In particular, APEDF alleged (1) retaliation in violation of the First Amendment, (2) racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, and (3) procedural unfairness in violation of the Due Process Clause of the Fourteenth Amendment. The district court

24-13547                Opinion of the Court                9

dismissed all three claims with prejudice under Federal Rule of Civil Procedure 12(b)(6).

This is APEDF's appeal.[1]

## II

The standard applicable under Rule 12(b)(6) is familiar. Dismissal for failure to state a claim is appropriate if, but only if, the plaintiff fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although we needn't accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," we must "accept as true" all factual allegations in the complaint. *Id.* at 663, 678.

We will consider the propriety of the dismissal of APEDF's claims in turn, beginning with its contention that the County retaliated against it in violation of the First Amendment.

## A

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory

---

[1] We "review[] de novo a district court's order of dismissal, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Mesa Valderrama v. United States*, 417 F.3d 1189, 1194 (11th Cir. 2005).

actions" for engaging in protected speech or association. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a valid First Amendment retaliation claim, APEDF must show (1) that it engaged in "constitutionally protected" activity, (2) that it "suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such" activity, and (3) that "there was a causal relationship between the adverse conduct and the protected [activity]." *Brannon v. Finkelstein*, 754 F.3d 1269, 1274 (11th Cir. 2014).

APEDF contends that the County violated its First Amendment rights by revoking one grant award and denying the application for another in retaliation for its expressive association with a disfavored group—the Uhuru Movement. The district court rejected that claim, seemingly on two grounds. As an initial matter, the court suggested that, as a new applicant for a government grant, APEDF might be barred from asserting a First Amendment retaliation claim under *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996). In that case, the Supreme Court held that an independent contractor with a preexisting commercial relationship with the government could bring such a claim but declined to decide whether *new* applicants for government contracts enjoy similar First Amendment protection. *Id.* at 685. Moreover, and in any event, the district court held that even if APEDF could assert a retaliation claim, it hadn't adequately alleged one.

For reasons we will explain, we hold (1) that *Umbehr* doesn't bar APEDF's claim and (2) that APEDF has alleged enough to survive a motion to dismiss.

**1**

First, *Umbehr*.   There, the Supreme Court considered whether and to what extent independent government contractors have First Amendment rights.  518 U.S. at 673–74.  A contractor who had an existing trash-hauling contract with a municipal government brought a First Amendment retaliation claim alleging that the county commission had terminated his at-will contract in retaliation for his public criticism.  *Id.* at 671–72.  The parties took diametrically opposite positions:  The plaintiff argued that because he was an independent contractor rather than an employee, the government lacked any interest that could diminish his speech rights and that he was therefore entitled to the full First Amendment protection enjoyed by ordinary citizens.  *Id.* at 677.  The County, by contrast, asserted that the contractor wasn't entitled to *any* First Amendment protection—not even the limited protection typically given to government employees.  *See id.* at 676.

The Supreme Court rejected both extremes in favor of a middle ground.  The Court noted that the relevant precedents existed on a "spectrum":

> Our unconstitutional conditions precedents span a spectrum from government employees, whose close relationship with the government requires a balancing of important free speech and government interests, to claimants for tax exemptions, users of public facilities, and recipients of small government subsidies who are much less dependent on the government but more like ordinary citizens whose viewpoints on

matters of public concern the government has no le-
gitimate interest in repressing.

*Id.* at 680 (internal citations omitted). The Court held that an inde-
pendent contractor who (like the plaintiff before it) has a preexist-
ing commercial relationship with the government is akin to a gov-
ernment employee and therefore entitled to comparable constitu-
tional protection. *Id.* at 678. Accordingly, a First Amendment re-
taliation claim brought by such a contractor triggers so-called *Pick-
ering*-balancing—"a fact-sensitive and deferential weighing of the
government employer's legitimate interests against its employees'
First Amendment rights." *Id.* at 668 (citing *Pickering v. Bd. of Ed. of
Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).

Even as it "recognize[d]" that independent contractors who
have preexisting relationships with the government have a (quali-
fied) right "not to be terminated for exercising their First Amend-
ment rights," *id.* at 686, the Supreme Court reserved the question
whether "bidders or applicants for *new* government contracts" are
entitled to First Amendment protection, *id.* (emphasis added). Re-
lying heavily on that limiting language, the County argues here that
because APEDF is only an aspiring contractor, not an established
one, it has no First Amendment rights. *See* Br. of Appellee at 12–
13. APEDF rejoins that it is less like an aspiring government con-
tractor than an ordinary citizen applying for a limited government
benefit. *See* Br. of Appellant at 23 (citing *Sherbert v. Verner*, 374 U.S.
398 (1963)). We think that APEDF has the better of the argument.

Where, as here, the government is doling out public funding, it operates as a sovereign rather than as an employer. Pinellas County wasn't seeking an ongoing relationship with APEDF, nor was it offering to pay APEDF to perform a service or to act as an agent. Rather, it was simply determining whether APEDF's contributions to the public justified an award of grant money. In that respect, APEDF is less like an employee or a traditional government contractor and "more like [an] ordinary citizen[] whose viewpoints on matters of public concern the government has no legitimate interest in repressing." *Umbehr*, 518 U.S. at 680; *cf. Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 38 (2d Cir. 2018) (holding that food vendors denied a license to sell in a public forum weren't prospective government contractors).

To be sure, APEDF wasn't (and isn't) legally *entitled* to a COVID-relief grant. And as the County emphasizes, the government doesn't engage in viewpoint discrimination simply because it "selectively fund[s] a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998) (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). That being said, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Id.* at 587 (quoting *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 550 (1983)); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit

for any number of reasons, there are some reasons upon which the government may not rely.").

The Supreme Court's decision in *National Endowment for the Arts v. Finley* illustrates the First Amendment's application to those seeking government grants and subsidies. There, the Court rejected a facial challenge to a funding provision in a statute governing an arts-related grant program. 524 U.S. at 572–73. The clause at issue required government officials to ensure that "artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). Unsuccessful grant applicants argued that the provision was "a paradigmatic example of viewpoint discrimination because it reject[ed] any artistic speech that either fail[ed] to respect mainstream values or offend[ed] standards of decency." *Id.* at 580. The Court disagreed, concluding that it did "not introduce considerations that, in practice, would effectively preclude or punish the expression of particular views." *Id.* at 583. Notably, though, in so doing, the Court described the sorts of circumstances that might give rise to a meritorious as-applied challenge:

> If the [government] were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. We have stated that, even in the provision of subsidies, the Government may not "ai[m] at the suppression of dangerous ideas,"

> *Regan v. Taxation With Representation of Wash.*, 461
> U.S. 540, 550 (1983) (internal quotation marks omit-
> ted), and if a subsidy were "manipulated" to have a
> "coercive effect," then relief could be appropriate.
> See *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S.
> 221, 237 (1987) (Scalia, J., dissenting); see also *Leathers
> v. Medlock*, 499 U.S. 439, 447 (1991) ("[D]ifferential tax-
> ation of First Amendment speakers is constitutionally
> suspect when it threatens to suppress the expression
> of particular ideas or viewpoints").

*Id.* at 587.

The essence of APEDF's First Amendment claim here is that the County manipulated the ARPA grant program to suppress ideas that it viewed as dangerous—namely, those associated with the Uhuru Movement. That, it seems to us, is the very kind of claim that the *Finley* Court suggested might have merit. Though the government can deny funding to applicants for many reasons, it "may not deny" even a discretionary "benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597; *see also Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("The appellees are plainly mistaken in their argument that, because a tax exemption is a 'privilege' or 'bounty,' its denial may not infringe speech.").

Accordingly, we reject the County's argument that *Umbehr* forecloses APEDF's First Amendment claim. We hold, to the contrary, that APEDF is entitled to the same First Amendment protection enjoyed by other grant applicants, with respect to which the

County acts more as sovereign than traditional (or quasi) employer. *See Umbehr,* 518 U.S. at 678 ("Umbehr is correct that if the Board had exercised sovereign power against him as a citizen in response to his political speech, it would be required to demonstrate that its action was narrowly tailored to serve a compelling governmental interest.").

Next, we consider whether APEDF has adequately stated a First Amendment retaliation claim.

**2**

Having concluded that APEDF is entitled to full (rather than diminished) First Amendment protection, we restate the governing test:  To state a First Amendment retaliation claim, APEDF must allege (1) that it engaged in "constitutionally protected" speech or associational activity, (2) that it "suffered adverse conduct that would likely deter a person of ordinary firmness from engaging" in that activity, and (3) that "there was a causal relationship between the adverse conduct" and the activity.  *Brannon,* 754 F.3d at 1274.

**i**

We think it clear that APEDF engaged in "constitutionally protected" activity.  The right to association "has been characterized as a right 'implicit' in the First Amendment." *O'Laughlin v. Palm Beach County,* 30 F.4th 1045, 1053 (11th Cir. 2022).  In particular, the Supreme Court has held that the First Amendment protects both intimate and expressive association, the latter of which is at issue here.  The Court has variously described expressive association as the "freedom to engage in association for the advancement

24-13547                Opinion of the Court                17

of beliefs and ideas," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958), and "the exercise of one's right to choose one's associates," *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987).

APEDF has plausibly alleged that it engaged in constitutionally protected expressive association. The complaint states that APEDF associates with those in the Uhuru Movement—which it calls "a broad pro-Black tendency" of "like-minded groups and individuals promoting Black community empowerment"—and that the County was made aware of its association as a result of the "apparent content of [its] website" and the name of its community center—the "Uhuru House." Am. Compl. ¶¶ 51(a), 54. The complaint further alleges that APEDF has served the black community of south St. Petersburg for 28 years by offering a variety of services, including the "Uhuru House" and a radio station called "Black Power 96." *Id.* ¶¶ 10, 51(a), 78. And APEDF's stated mission—"defend[ing] the human and civil rights of the African community"—unquestionably aligns with the Uhuru Movement's goal of black empowerment. *Id.* ¶ 1. Taken together, the complaint's allegations about engaging in expressive association satisfy Rule 12(b)(6)'s plausibility threshold.

**ii**

On, then, to whether APEDF adequately alleged that it suffered adverse conduct of the sort that "would 'chill a person of ordinary firmness' in the plaintiff's position from engaging in 'future First Amendment activity.'" *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S.

468, 477 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 397 (2019)); *see Brannon*, 754 F.3d at 1274. Taking the facts as pleaded, we ask whether a grant applicant "of ordinary firmness" would be deterred from associating with a disfavored group by the revocation of one sizeable monetary grant and the denial of another.

We've said that one function of the objective ordinary-firmness test is to "weed[] out" suits in which "the injuries complained of are trivial or amount to no more than *de minimis* inconvenience in the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005). "Some adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment." *Hous. Cmty. Coll. Sys.*, 595 U.S. at 477. But of course, "no one would think that a mere frown from a supervisor constitutes a sufficiently adverse action to give rise to an actionable First Amendment claim." *Id.* Along that spectrum—from criminal punishment to side-eye—the revocation and denial of government grants fall somewhere in the middle.

Pointing to the significance of the grants to its operations, APEDF claims that the County's actions would likely deter a non-profit of ordinary firmness from engaging in expressive association. The County denies the existence of any chill because, it says, APEDF (1) "is free to engage in protected expressive association (including with the Uhuru Movement) without the benefit of grant funding" and (2) "in fact it does so." Br. of Appellee at 19 (quoting Dist. Ct. Ord., Sept. 30, 2024, at 7–8). Again, we think APEDF has the better of the argument.

To take the County's second rejoinder first, it mistakes what is an objective test for a subjective one. Our precedent doesn't require a First Amendment plaintiff to allege that the government's retaliatory action *in fact* deterred *it* from engaging in protected activity. Rather, the question is whether the allegedly "adverse conduct . . . would *likely* deter *a person of ordinary firmness* from engaging" in such activity. *Brannon*, 754 F.3d at 1274 (emphasis added). Accordingly, the mere fact (even if true) that APEDF has continued to associate with the Uhuru Movement, even after the revocation and denial of its grants, is not dispositive. The question isn't what APEDF has done, but rather what a nonprofit of ordinary firmness in its circumstances would do.

So, what of the County's principal contention—that, as a matter of law, the denial of "the benefit of grant funding" can't cause the requisite objective chill? Br. of Appellee at 18. The short answer is that Supreme Court precedent is to the contrary. In particular, the Court's unconstitutional-conditions decisions—to which we've already alluded, *see supra* at 13–15—make clear that the denial of a government benefit for speech-discriminatory reasons *can* have a chilling effect because that type of denial can operate to penalize a speaker's viewpoint.

In *Speiser v. Randall*, the Supreme Court considered the constitutionality of a state statute that required applicants for a tax exemption to attest that they hadn't advocated the overthrow of the government. 357 U.S. at 515–17. There, as here, the government asserted that because the tax exemption was a mere "privilege" or

"bounty," its denial didn't infringe would-be recipients' speech. *Id.* at 518. The Court disagreed:

> To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech. . . . [T]he denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech.

*Id.*

The Supreme Court reiterated the same point in *Finley.* As already discussed, the Court explained there that while the government may "selectively fund a program to encourage certain activities it believes to be in the public interest," 524 U.S. at 588 (citation modified), it may not "leverage its power to award subsidies . . . into a penalty on disfavored viewpoints," *id.* at 587. The Court further emphasized that "relief could be appropriate" where "a subsidy [is] 'manipulated' to have a 'coercive effect.'" *Id.* (quoting *Ragland,* 481 U.S. at 237 (Scalia, J., dissenting)).

APEDF has adequately alleged that it was put in a sufficiently "coercive" position here. The County offered nonprofits an opportunity to apply for grants to mitigate and remediate the financial harm caused by the global COVID pandemic. APEDF prepared and submitted two competitive grant applications explaining the economic harm it had suffered as a result of COVID and its need for the grants. It scored high on objective markers, and it initially won a $36,801 grant for radio equipment to permit Black

Power 96 to "continue broadcasting timely information on local health and educational services and emergency alerts." Am. Compl. ¶ 25. Then, though, APEDF claims that on account of its association with the Uhuru Movement, its first grant was revoked and its second application—for a $67,327 grant to purchase an "urgently needed" back-up power generator—was denied. *Id.* ¶ 88; *see id.* ¶¶ 53–56. Giving it the benefit of reasonable inferences, APEDF has plausibly alleged that the County effectively punished it for associating with the Uhuru movement—forcing it to choose between that association and an important infusion of cash that, by objective markers, it seemed to have warranted.

### iii

Last up, whether APEDF adequately alleged that "there was a causal relationship between the adverse conduct" and its protected activity. *Brannon*, 754 F.3d at 1274 (citation modified). The Supreme Court has expressed the required causal relationship in but-for terms: The question is whether "the government took an 'adverse action' in response to [plaintiff's constitutional activity] that 'would not have been taken absent the retaliatory motive.'" *Hous. Cmty. Coll. Sys.*, 595 U.S. at 477 (quoting *Nieves*, 587 U.S. at 399).

We hold that APEDF has plausibly alleged the necessary link. Together, the records of the text exchanges between Board member Chris Latvala and his aide Tyler Bonneau and the transcripts of the Board's work-session meeting give rise to the reasonable inferences (1) that Latvala objected to funding APEDF because

of its association with the Uhuru Movement, and (2) that the Board heeded Latvala's objection and revoked APEDF's first grant and denied its application for the second because of APEDF's association with the Uhurus.

First, Latvala's motivation:   Prior to any adverse action against APEDF, Latvala sent his aide several messages that give rise to a reasonable inference that Latvala harbored animus toward the Uhurus and believed that APEDF was associated with them.  As already explained, following Latvala's instruction to "Google the African peoples" group, Bonneau reported back that APEDF was "the Uhuru House on St. Pete" and that its "website d[id]n't look so good."  Am. Compl. Ex. F at 2.  Latvala responded that he was "going to raise hell."  *Id.*  The texts also show that Latvala asked his aide to "look to see if this African group is a hate group or the uhurhus [sic] by ADL or sovern [sic] poverty law center."  Am. Compl. Ex. G at 1.

Then, at a Board work session, Latvala opposed funding APEDF because "[a]ccording to [its] website" the group was "associated with the [Uhurus]."  Am. Compl. Ex. H at 1.  Repeating information from an ADL source, Latvala asked Foundation CEO Duggan Cooley, "[H]ow would a group that has ties to anti-semitic nationalist groups get approved for funding?"  *Id.*  Cooley responded that although the Foundation initially had concerns about APEDF's association with the Uhurus, the County had advised it to score APEDF like "every other organization."  *Id.*  At the same meeting, Latvala also asserted that the Uhurus "once held a mock

trial in which they sentenced the mayor and chief of police in St. Petersburg to death" and "support the release of all black prisoners." *Id.*

After the work session concluded, Latvala texted his aide again. Those messages show not only that Latvala began calling APEDF "the Uhurus" but also that he planned to use a pretextual reason to revoke APEDF's grant funding. He noted that "the [U]hurus are claiming we are discriminating if we defund them," but, he said, "One of my questions yesterday was about political parties being eligible so we are going to use that." Am. Compl. Ex. G at 3. "[T]his," he boasted, "ain't my first rodeo." *Id.*

Just a few days later, at a Board meeting, Latvala formally moved to revoke the funding for APEDF's radio equipment. He said there that radio stations weren't a worthwhile investment: "I do not think that we should be funding radio stations with the amount of needs that there are in our community"; rather, the County should be "prioritizing people over products and things." Am. Compl. ¶ 82. But the record (such as it is) reveals an alternative explanation that can't be discounted. Given Latvala's text messages and his lengthy discussion with Cooley at the work session, it's reasonable to infer that he was actually motivated by APEDF's association with the Uhurus.

Second, the Board's reliance on Latvala's objection: The record also permits a reasonable inference that Latvala's Uhuru-related objections motivated the Board's decision to revoke APEDF's first grant and deny its application for the second. Recall the

sequence of events:  County staff ranked APEDF's first application fourth out of 55, and on that basis the Board actually awarded APEDF a $36,801 grant—only to revoke it (*alone* among all grants) following Latvala's anti-Uhuru advocacy at the work session.  *Id.* ¶¶ 26–39.  So too, APEDF's second application ranked high—fourth out of 78—but the Board declined to fund it (again, *alone* among all applicants the Foundation recommended funding).  *Id.* ¶¶ 47, 50, 90.  The inference that the Board acted as it did based on Latvala's urging is not unreasonable.

⋆        ⋆        ⋆

For the foregoing reasons, we hold (1) that APEDF is entitled to the full First Amendment protection enjoyed by ordinary citizens, not the qualified protection given to government employees and established government contractors, and (2) that it has plausibly alleged that the County revoked its first grant and denied its application for a second grant on account of its protected association with the Uhuru Movement.  Accordingly, we reverse the district court's dismissal of APEDF's First Amendment retaliation claim and remand for further proceedings.

## B

In its complaint, APEDF also alleged that the County discriminated against it on the basis of race, in violation of the Fourteenth Amendment, when it revoked its first grant and denied the second.

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. To make out a race-discrimination claim under the Equal Protection Clause, a plaintiff must show that it was subjected to a government policy or determination that was animated by a discriminatory intent or purpose. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188–89 (11th Cir. 1999); *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

In its complaint, APEDF alleged that the County discriminated against it on the ground that it is a "Black-led and Black Community directed Organization." Am. Compl. ¶ 78. In particular, APEDF asserted that by revoking and denying its grants, the County intentionally discriminated against it vis-à-vis non-black-led and -directed nonprofits. The district court held that APEDF had failed to state a valid equal-protection claim. As an initial matter, the court doubted "whether a corporate entity can have a 'race' at all." *Afr. People's Educ. & Def. Fund, Inc. v. Pinellas County*, No. 8:23-cv-2395-TPB-AAS, 2024 WL 4349345, at *5 (M.D. Fla. Sep. 30, 2024) (citing *Arlington Heights*, 429 U.S. at 263). But even assuming that it could, the court concluded that APEDF had failed to state a plausible claim of intentional race discrimination because it hadn't "allege[d] sufficient facts to discern the racial identities of [APEDF] itself or the 'similarly situated' entities that applied for and received grant money." *Id.*

For reasons we'll explain, we hold that APEDF (1) didn't need to "take on" a particular racial identity in order to assert an

26                    Opinion of the Court                    24-13547

equal-protection claim for racial discrimination and (2) has alleged enough to survive a motion to dismiss.

**1**

We begin with the question whether APEDF, as an inanimate corporation, can assert a claim for race discrimination under the Equal Protection Clause. Taking a cue from our existing precedent, we conclude that it can. The district court rejected APEDF's claim on the ground that it had not alleged sufficient facts to determine its racial identity or that of its comparators. We hold, to the contrary—and consistent with our caselaw—that a corporate entity needn't assume a racial identity in order to bring a race-discrimination claim under the Equal Protection Clause.[2] Rather, even a "colorless" corporation (our term) can suffer—and sue to vindicate—its own injury caused by a government actor's intentionally discriminatory conduct, even if that conduct is directed at others. *See Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1044 (11th Cir. 2008); *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989).

In *Young Apartments*, we held that a corporation that owned an apartment complex occupied primarily by Hispanic individuals

---

[2] We've never squarely decided whether a corporation can take on a racial identity, *see Sheba Ethiopian Rest., Inc. v. DeKalb County*, No. 21-13077, 2023 WL 3750710, at *1 (11th Cir. June 1, 2023) ("[T]here's no binding law in this circuit clearly establishing that a corporation can have a race or that officials can discriminate against a corporation because of the corporation's race."), and we don't do so here.

had standing to bring an equal-protection claim for race discrimination against a city that allegedly adopted and enforced a zoning ordinance as part of "[an] effort to eliminate available and affordable housing for Hispanic immigrant workers."  529 F.3d at 1033. We pointed out that other federal appellate courts had "similarly found that a non-minority plaintiff has standing to allege that it was injured by defendants' discriminatory animus toward third parties."  *Id.* at 1040–41 (collecting cases).  We said that our holding flowed naturally from "the uncontroversial principle that it is unconstitutional for a state actor, motivated by discriminatory animus, to interfere with an individual's right to contract or associate with members of a protected class."  *Id.* at 1039 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–51 (1970) ("Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions . . . .")).  Notably, we didn't focus on the racial identity of the corporation; it was enough, we held, that it alleged an injury caused by animus directed toward its Hispanic residents.  *Id.* at 1039–41; *see also Baytree*, 873 F.2d at 1408–09 (holding that a corporate real-estate developer could bring a race-discrimination claim challenging a zoning ordinance allegedly motivated by animus against black residents).

In the same way here, it is ultimately irrelevant whether a race can properly be imputed to APEDF itself.  APEDF alleges that the County discriminated against it because many of its leaders are black, most of its staff and volunteers are black, and it serves the black community.  In other words, APEDF alleges that it was

28                    Opinion of the Court                    24-13547

treated unequally because it contracts with and "associate[s] with members of a protected class." *Young Apartments*, 529 F.3d at 1039. Under our precedent, that is enough.[3]

In rejecting APEDF's equal-protection claim, the district court pointed to a statement in the Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.* that, at least on its face, seemed to question the ability of a corporation to sue for race discrimination under the Equal Protection Clause.  For reasons we'll explain, the statement doesn't undermine our conclusion.

In *Arlington Heights*, the Supreme Court had to decide, among other issues, whether either of two plaintiffs had standing to bring a Fourteenth Amendment race-discrimination claim.  Both

---

[3] In so holding, we're in good company.  Every other circuit to address the issue has held that a corporation can allege race discrimination. *See Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 14 (1st Cir. 1979); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982); *Woods v. City of Greensboro*, 855 F.3d 639, 645 (4th Cir. 2017); *White Glove Staffing, Inc. v. Methodist Hosps. of Dall.*, 947 F.3d 301, 305–06 (5th Cir. 2020); *Inner City Contracting, LLC v. Charter Township of Northville*, 87 F.4th 743, 753 (6th Cir. 2023); *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 591 (7th Cir. 1989), *abrogated on other grounds by Umbehr*, 518 U.S. 668; *Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 880–82 (8th Cir. 2003); *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004); *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002); *Gersman v. Grp. Health Ass'n*, 931 F.2d 1565, 1568 (D.C. Cir. 1991), *vacated on other grounds by* 502 U.S. 1068 (1992). Although a number of the decisions arose under 42 U.S.C. § 1981, two involved Fourteenth Amendment equal-protection claims. *See Hudson Valley Freedom Theater, Inc.*, 671 F.2d at 707; *Triad Assocs., Inc.*, 892 F.2d at 590–91.

(1) a corporation looking to build multi-family housing and (2) a black plaintiff who alleged that he was a prospective tenant had sued challenging the town board's denial of the corporation's request to rezone the area from single- to multi-family. *See* 429 U.S. at 263–64. Because the Court concluded that the would-be tenant had standing, it sidestepped the question whether the corporation could sue:

> In the ordinary case, a party is denied standing to assert the rights of third persons. But we need not decide whether the circumstances of this case would justify a departure from that prudential limitation and permit [the corporation] to assert the constitutional rights of its prospective minority tenants. For we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own.

*Id.* (citations omitted). Notably, though, along the way, the Court stated that "a corporation . . . has no racial identity and cannot be the direct target of the petitioners' alleged [racial] discrimination." *Id.* at 263.

To be fair, that last bit sounds pretty damning. We agree with Judge Friendly, though, that in context the remark is "of only academic importance." *Hudson Valley*, 671 F.2d at 704. The reason, as he explained, is that the Court's statement was paradigmatic dictum. Having concluded that the would-be tenant had standing, the Court found it unnecessary to definitively decide anything about the corporation's own right to sue. *See id.* at 705 ("The Court

therefore never did resolve the question of [the corporation's] standing, and the cases cited by it indicate that any resolution might well have been favorable.").

While we must of course give Supreme Court dicta appropriate deference, *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006), we agree with our sister circuits that the *Arlington Heights* dictum is "unpersuasive," *Inner City Contracting, LLC*, 87 F.4th at 753, for two reasons. First, it seems to have been overtaken by intervening events. Since *Arlington Heights*, the Supreme Court has strongly signaled that corporations *may* bring race-discrimination claims. Perhaps most notably, in *City of Richmond v. J.A. Croson Co.*, the Court ruled in favor of a corporation that challenged a minority-set-aside contracting program as a violation of its rights under the Equal Protection Clause. 488 U.S. 469, 511 (1989). And more recently, in *Domino's Pizza, Inc. v. McDonald*, the Court noted that "the Courts of Appeals [that] have considered the issue have concluded that corporations may raise § 1981 claims" alleging race discrimination in contracting. 546 U.S. 470, 473 n.1 (2006). And perhaps most tellingly of all, our own precedents haven't viewed *Arlington Heights* as a bar; in both *Young Apartments* and *Baytree*, we cited the Supreme Court's decision in the course of holding that the corporations before us in those cases *could* bring race-discrimination claims. *See Young Apartments*, 529 F.3d at 1045; *Baytree*, 873 F.2d at 1408–09.

Second, and separately, a rule permitting corporate entities to bring race-discrimination claims follows from the law's

"personification" of corporations more generally. *See, e.g.*, *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 881 n.9 (1985) ("It is well established that a corporation is a 'person' within the meaning of the Fourteenth Amendment."); *see also id.* at 883 (permitting a foreign corporation to challenge a tax statute on equal-protection grounds); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) (collecting cases recognizing that "First Amendment protection extends to corporations"). As Judge Friendly observed in *Hudson Valley*, "[i]t is not apparent why a corporation, although entitled to advance equal protection challenges based on inequality in taxation or regulation, should lack standing to complain of discrimination because of its activities or stock ownership based on racial grounds—the core of the equal protection clause." 671 F.2d at 706 (footnote omitted). What Judge Friendly said there is equally applicable here: The nonprofit corporation is "in a better position than anyone else to challenge discriminatory practices leading to cutting its grant funds." *Id.*[4]

**2**

So, the ultimate question: Has APEDF plausibly alleged that it was subjected to a state policy or determination that was animated by a racially discriminatory intent or purpose?

---

[4] To be sure, some constitutional rights are reserved for natural persons. *See, e.g.*, *United States v. White*, 322 U.S. 694, 698 (1944) (concluding that the right against self-incrimination is reserved for natural persons). But it's not apparent to us that the right to be free from intentional race-based discrimination is one of them.

"Discriminatory purpose may be established by proof that the [government] used race as a substantial or motivating factor in its . . . decisions and practices . . . ." *Burton*, 178 F.3d at 1189. To determine whether a challenged decision was the product of race discrimination, we look to both direct and circumstantial evidence of intent. *Id.* "[R]elevant evidentiary factors include substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision." *Id.* (citing *Arlington Heights*, 429 U.S. at 265–69). It is also relevant whether the government treated "similarly situated" individuals—or in this case, nonprofits—more favorably. *Young Apartments*, 529 F.3d at 1045.

APEDF has plausibly alleged both direct and circumstantial evidence indicating that the County acted with a prohibited discriminatory intent. As for direct evidence, there are the blatantly race-coded texts between Latvala and Bonneau. Latvala's opening salvo indicates that it was APEDF's name that initially caught his eye: "Google the African peoples one." Am. Compl. Ex. F at 2. Then, in a follow-up, he stated: "[S]ee if this African group is a hate group." Am. Compl. Ex. G at 1. In the same exchange, he asked whether radio equipment specified in one of the grant applications was "for [B]lack [P]ower 96." *Id.* at 2. And continuing in the same vein, at a later Board work session, Latvala objected to the fact that APEDF was associated with the Uhurus, who, he said, were reportedly tied to "black nationalist groups." Am. Compl. Ex. H at 1.

Circumstantial evidence also plausibly indicates that the County acted with a discriminatory purpose. *First*, it appears that the County took "procedural and substantive departures from the norms [it] generally followed" when revoking and denying APEDF's funding requests. *Burton*, 178 F. 3d at 1189; *see also Arlington Heights*, 429 U.S. at 267. APEDF's first grant application was ranked fourth out of 55 applications. The Board then awarded funding to the 34 top-ranked organizations, including APEDF. Notably, APEDF's was the *only* grant award later revoked, and it was revoked without notice. So too with respect to APEDF's second grant application: It (too) was ranked highly—this time fourth out of 78 applications. County staff recommended removing three organizations, including APEDF, from the list, but the Board ultimately funded all the applicants on the list *except* APEDF.

*Second*, APEDF has plausibly alleged that the County treated similarly situated white-coded comparators more favorably—and, further, that the County's explanations for its differential treatment don't hold water. For instance, with respect to the revocation of APEDF's first grant, Latvala asserted at a Board meeting that the County should "prioritiz[e] people over products and things." Am. Compl. ¶ 82. But as APEDF's complaint explains, while its grant was revoked, four nonprofits that serve predominantly white communities—and are not black-led—obtained funding for similar "products and things"—building renovations, computers, a truck, furniture, etc. *See id.* ¶ 85.

So too with respect to APEDF's second grant application, which requested money to fund a back-up power generator. Although, as already noted, APEDF's application was ranked fourth out of 78, in the Foundation's recommendation list APEDF's entry was accompanied by a footnote flagging "concerns about the inability to isolate this applicant's project to the sole benefit of a 501(c)[(]3[)] direct service nonprofit"—*i.e.*, to ensure that APEDF wasn't planning to share its generator with another entity. Am. Compl. Ex. Q at 2, Dkt. No. 35–17. In its complaint, APEDF alleges that location-sharing concerns don't appear in the eligibility criteria posted on the Foundation's ARPA Nonprofit Capital Project Fund's website and, further, that numerous ARPA grant recipients (including the YMCA) share spaces with other groups. Am. Compl. ¶ 46. Ultimately, Commission staff recommended "unassign[ing]" APEDF's funding on the ground that its "project . . . w[ould] not directly counteract the effects of COVID-19." Am. Compl. Ex. R at 1, Dkt. No. 35–18. The Board then voted to fund all the organizations recommended by the County—including two others that staff recommended unassigning—except for APEDF. The problem, APEDF says, is that three nonprofits that serve predominantly white communities (and were not black-led) received funding for projects that likewise wouldn't "directly counteract the negative economic impact of COVID"—for instance, for a new building, vehicles, and heavy equipment. Am. Compl. ¶ 89.

It's not enough to say, as the County does, that APEDF's comparators aren't "identical in all relevant respects." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006). To be sure, we've

said in other types of equal-protection cases that this standard is relevant at summary judgment, *see Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc), but here we are concerned with *Arlington Heights'* application at the pleading stage. Accordingly, the question is simply whether, giving it the benefit of all reasonable inferences, APEDF has plausibly alleged that it was treated differently for racially discriminatory reasons. APEDF's assertion that several white-coded organizations were funded, despite issues of the same sort that were cited as reasons for the revocation and denial of its requests, underscores its circumstantial-evidence case.

*Finally*, APEDF has plausibly alleged that the County sought to establish a pretext for its discriminatory conduct. Recall one of Latvala's texts to Bonneau: "[T]he [U]hurus are claiming we are discriminating if we defund them." Am. Compl. Ex. G at 3. But, he continued, "One of my questions yesterday was about political parties being eligible [for funding] *so we are going to use that*"—because, he boasted, "this ain't my first rodeo." *Id.* (emphasis added).

★  ★  ★

Giving it the benefit of all reasonable inferences, APEDF has plausibly alleged that the County intentionally discriminated against it on the basis of race when it revoked its previously awarded grant for radio equipment and then denied its second grant request. Accordingly, we reverse the district court's dismissal of APEDF's equal-protection claim and remand for further proceedings.

## C

Finally, in its complaint, APEDF alleged that the County violated its due process rights when it revoked its initial grant award without giving it notice and an opportunity to be heard.

In relevant part, the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To state a traditional procedural-due-process claim, a plaintiff must allege "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Worthy v. City of Phenix City*, 930 F.3d 1206, 1223 (11th Cir. 2019) (citation modified). The district court dismissed APEDF's due process claim on two grounds: (1) that it failed to allege a constitutionally protected interest; and (2) that it failed to demonstrate that it had been denied constitutionally adequate process. Because we agree on the first ground, we needn't address the second.

Property interests (at issue here) ordinarily don't arise from the Constitution itself; "[r]ather[,] they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Therefore, perhaps most famously, the plaintiffs in *Goldberg v. Kelly*, 397 U.S. 254 (1970), had a "property" interest in the welfare payments they sought, because a statute

defined the eligibility criteria for those payments. *Roth*, 408 U.S. at 577.

Unlike the welfare recipients in *Goldberg*, though, APEDF hasn't identified any independent source of law securing to it the right to an ARPA grant. First, APEDF hasn't pointed to any law, regulation, or policy that requires the County to award grants to particular entities based on particular criteria. To the contrary, the pertinent rules governing the grant program, as listed on the Foundation's website, specified only that applications were open to § 501(c)(3) direct-service nonprofits that served Pinellas County residents and could "demonstrate a negative, unremedied economic harm caused by the COVID-19 pandemic." Am. Compl. Ex. O at 1, Dkt. No. 35–15. Beyond those baseline eligibility criteria, though, grant awards were within the discretion of County officials. And controlling "cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

Second, and separately, APEDF claims a constitutionally protected interest in the contract for the radio-equipment grant that it signed and then returned to the Foundation. The parties dispute whether the contract was enforceable under Florida law given that the County never countersigned it. We needn't wade into those waters because even if APEDF's signature alone rendered the agreement an enforceable contract, our precedent indicates that it wouldn't have created a constitutionally protected

property interest. In particular, in *Medical Laundry Services v. Board of Trustees of University of Alabama*, we held that a business that was awarded a bid to provide services to a public hospital didn't have a constitutionally protected property interest in its contract. 906 F.2d 571, 573 (11th Cir. 1990). In so holding, we emphasized that "the broad interpretation that any time one has an enforceable contract to which the State is a party, there is constitutionally protected property interest under that contract . . . is inconsistent with the concept of the Fourteenth Amendment." *Id.* (citation modified); *see Redondo-Borges v. HUD*, 421 F.3d 1, 10 (1st Cir. 2005) (similarly holding that a contractor's interest in a bid award that was later rescinded "d[id] not rise to the level of a constitutionally protected property interest").

For these reasons, the district court was correct to hold that APEDF failed to allege the deprivation of a constitutionally-protected interest, and we therefore affirm its dismissal of APEDF's due process claim.[5]

---

[5] The district court also concluded that APEDF's due process claim failed because it has an adequate state remedy. *See Cotton v. Jackson*, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000) ("[P]rocedural due process violations do not even exist unless no adequate state remedies are available."). At most, it said, APEDF has alleged the breach of a grant agreement, which it could remedy through a lawsuit. *Afr. People's Educ. & Def. Fund, Inc. v. Pinellas County*, No. 8:23-CV-2395-TPB-AAS, 2024 WL 4349345, at *4 (M.D. Fla. Sept. 30, 2024).

Our sister circuits have likewise held that a post-deprivation breach-of-contract action is an adequate state-law remedy for due process purposes. *See Kaminski v. Coulter*, 865 F.3d 339, 348 (6th Cir. 2017) ("[A] state breach of contract action may . . . provide an adequate remedy for some deprivations of

24-13547            Opinion of the Court            39

## III

To sum up:  We reverse the district court's dismissal of APEDF's claims under the First Amendment and Equal Protection Clause and remand for further proceedings.  We affirm the district court's dismissal of APEDF's claim under the Due Process Clause.

**AFFIRMED** in part, **REVERSED** and **REMANDED** in part.

---

a contractually created property interest."  (citation modified)); *Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004) ("All states provide judicial remedies for breach of contract and these remedies will almost always provide all the process that is constitutionally due . . . .").  Because we conclude that APEDF failed to allege a constitutionally protected property interest, we needn't decide the adequate-state-law-remedy issue.